UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| SHIRLEY MICHAUD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Docket No. 1:15-cv-359-NT |
| | ) |
| CALAIS REGIONAL HOSPITAL, | ) |
| | ) |
| Defendant. | ) |

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The surviving wife of Hermel Michaud ("**Michaud**") brought suit against Calais Regional Hospital, alleging violations of the Emergency Medical Treatment and Active Labor Act ("**EMTALA**"), 42 U.S.C. § 1395dd. Before me is Calais Regional Hospital's motion for summary judgment. Def.'s Mot. for Summ. J. (ECF No. 54). For the reasons stated below, the motion is **DENIED**.

BACKGROUND

The following account is taken from the parties' statements of material facts, credited to the extent that the facts are either admitted or supported by record citations.[1] I take the facts in the light most favorable to the non-movant.

---

[1] The parties pushed the limits of Local Rule 56 in several respects. The Plaintiff failed to provide citations to specific facts immediately following the assertion of that fact and instead frequently included compound cites at the end of paragraphs containing multiple facts. Rule 56(f) requires "specific citation," and it facilitates my analysis when the citations are presented fact by fact. In addition, the Plaintiff's "qualifications" of the Defendant's facts occasionally exceeded the scope of the asserted fact. Such material facts beyond the scope of the Defendant's facts should be presented separately as the Plaintiff's additional facts, in accord with Local Rule 56(c). On the other side, the Defendant repeatedly stated lengthy "objections" beneath the Plaintiff's qualifications. The Defendant used these objections to advance arguments and offer additional qualifying facts in reply to the

Michaud had a medical history of Alzheimer's dementia and chronic renal failure. Joint Statement of Material Facts ("**JSMF**")[2] ¶¶ 4, 90 (ECF No. 63). Michaud's dementia caused him to have difficulty managing his medication, as well as problems with memory, attention, and language.[3] JSMF ¶¶ 91-92. On November 20, 2013, Michaud was undergoing dialysis at the Sunrise County Dialysis when he experienced a syncopal episode, meaning he experienced a "sudden loss of consciousness and postural tone that spontaneously resolves." JSMF ¶¶ 1-2. Michaud's body spasmed, his dentures fell out, and he stopped breathing for several moments. JSMF ¶¶ 2, 46-47. Sunrise staff placed external defibrillator pads on Michaud, but he regained consciousness independently. JSMF ¶ 47. An ambulance took Michaud to the Calais Regional Hospital, where he arrived at approximately 4:08 p.m. and was admitted at 4:20 p.m. JSMF ¶ 5.

James Mullen, M.D. was the attending emergency department physician at the time. JSMF ¶ 7. There is no written hospital protocol in the record for specific screening procedures that are triggered by an emergency department patient arriving with syncope and chronic renal failure, but Dr. Mullen described his protocol in comparable instances. JSMF ¶¶ 38, 42. When a patient arrives in the emergency department after a syncopal episode, Dr. Mullen first looks for an "immediate life

---

Plaintiff's qualifications. Local Rules 56(d) and 56(e) limit a party's reply to only the opposing party's additional facts and requests to strike.

[2]    This document is self-styled Defendant's Objection to Plaintiff's Opposing Statement of Material Facts, but it contains the entire collection of the parties' asserted facts and responses.

[3]    The Defendant objects to this statement on the grounds that the medical records supporting it are from years before the incident at Calais Regional Hospital. The records also establish, however, and it is widely known, that Alzheimer's dementia is a progressive disease.

threat" to the patient and then for evidence that the cause of the symptoms puts the patient at high or low risk. JSMF ¶¶ 27-29. Dr. Mullen stated that "[a]s soon as they have any high-risk feature, such as age, comorbidities, findings on the diagnostics . . . then usually admission would happen." JSMF ¶ 42. Regarding the age indicator, Dr. Mullen stated "any patient over the age of 50, my likelihood of recommending admission is going to be extremely high" and also that "for patients who present with syncope in [Michaud's] age group, it's a required admission to the hospital." JSMF ¶¶ 28, 42. Dr. Mullen further stated that a patient with similar symptoms "is going to require further diagnostics, including prolonged cardiac monitoring, to better elucidate the cause of the syncope." JSMF ¶ 42. This is because "[t]here could be a life-threatening condition." JSMF ¶ 42.

In this instance, Dr. Mullen provided the following screening. First, he categorized Michaud as high risk. JSMF ¶ 82. Dr. Mullen "thought cardiac was the number one cause," and dangerous "cardiac causes were at the top of the list." JSMF ¶¶ 22, 84. Cardiac causes are the most common life-threatening conditions associated with syncope. JSMF ¶ 83. Dr. Mullen's list also included less dangerous cardiac conditions that can cause syncope in conjunction with dialysis. JSMF ¶ 22. Dr. Mullen then ordered several diagnostic tests for Michaud. From 4:20-4:37 p.m., a nurse took Michaud's vital signs and pertinent medical history. JSMF ¶ 9. At 4:35 p.m., Michaud was placed on a cardiac monitor. JSMF ¶ 11. A nurse collected a blood sample at 5:10 p.m., and Dr. Mullen received the laboratory results at 5:52 p.m. JSMF ¶ 12. An

electrocardiogram ("**EKG**") for Michaud was administered at 5:45 p.m. JSMF ¶ 11. X-ray film was taken of Michaud at 5:46 p.m. JSMF ¶ 15.

From these tests, Dr. Mullen observed that Michaud's heart beat rate was slow, with a prolonged QT interval greater than 500 milliseconds. JSMF ¶¶ 13, 88. Dr. Mullen noted that this was a "significant finding" because it put Michaud at risk of torsade de pointe, an arrhythmia that can lead to sudden cardiac death. JSMF ¶¶ 17, 85. The EKG also showed Michaud had a bradycardic sinus rhythm, or slow heart beat rhythm. JSMF ¶¶ 13, 17. Aside from these cardiac indications, Dr. Mullen recorded that Michaud was "asymptomatic and physiologically stable." JSMF ¶ 19. Dr. Mullen recorded that Michaud's vital signs were otherwise normal, his laboratory results were "essentially normal," and the results of the x-ray were normal. JSMF ¶¶ 14, 16. Michaud was "alert and oriented, with a normal mood and affect," although he complained of feeling tired, and having pain in his legs and back, and he was growing impatient and agitated. JSMF ¶ 20.

Based on the screening to this point, Dr. Mullen determined it was necessary to admit Michaud for cardiac monitoring to "figure out why his heart was doing what it was doing." JSMF ¶¶ 24, 32, 85. Although Dr. Mullen stated the test results provided no "clear evidence" that Michaud's syncope was caused by a cardiac condition, he was concerned with Michaud's age, complex comorbidities, and the risks presented by the EKG results. JSMF ¶¶ 24, 28, 88. Dr. Mullen told Michaud that syncope "is something that does require admission." JSMF ¶ 82.

4

Calais Regional Hospital did not offer dialysis, however, and Dr. Mullen believed there was an unwritten hospital policy not to admit a dialysis patient. JSMF ¶ 38. Dr. Mullen therefore determined it was necessary to transfer Michaud to the Eastern Maine Medical Center for further cardiac monitoring. JSMF ¶¶ 36, 62. Dr. Mullen stressed to Michaud that the transfer was necessary. JSMF ¶ 64.

Michaud initially resisted transfer. JSMF ¶¶ 64-65. However, Michaud was accompanied at the hospital by his wife Shirley Michaud and step-daughter Brenda Donaghy. When Donaghy arrived, she informed hospital staff that she needed to be with Michaud to help him understand the questions asked of him. JSMF ¶ 54. She was present on three of approximately five occasions when Dr. Mullen checked in on Michaud, including when Dr. Mullen told Michaud that transfer was necessary, and she convinced Michaud not to object. JSMF ¶¶ 57, 66, 68. A nurse confirmed that Michaud would be transferred, and then Donaghy left the hospital to pack a bag in preparation for accompanying Michaud to Eastern Maine Medical Center. JSMF ¶¶ 69-70. Donaghy left her phone number and asked the nurse to call if something happened regarding Michaud or his transfer. JSMF ¶ 71.

After Donaghy left, Dr. Mullen stuck his head in the door of Michaud's room and told him that he was not being transferred and was being sent home. JSMF ¶ 72. Dr. Mullen recommended that Michaud follow up with his nephrologist and primary care physician for placement of a portable Holter heart monitoring device. JSMF ¶ 32. The cause of Michaud's syncope remained unknown to Dr. Mullen, but his final report states that the "syncopal episode was most likely due to some mild bradycardia that

5

during dialysis caused a transient hypotension which caused myoclonic activity." JSMF ¶¶ 24-26. Dr. Mullen's final diagnosis for Michaud was "acute syncope" and "chronic renal failure." JSMF ¶ 26. Michaud's wife went to get the car while nursing staff discussed discharge instructions with Michaud. JSMF ¶ 73.

Michaud was discharged at 8:10 p.m.[4] JSMF ¶ 30. He had been in the hospital for just under four hours. JSMF ¶¶ 5, 30. Upon discharge, Michaud's wife drove him the two minute trip from the hospital to their home. JSMF ¶ 75. Five minutes after entering the house, Michaud collapsed. JSMF ¶ 76. An ambulance was dispatched at 8:37 p.m., and the emergency medical team attempted CPR and defibrillation. JSMF ¶¶ 78-79. Efforts to revive Michaud ceased at 9:25 p.m. JSMF ¶ 80. Michaud is believed to have died of a malignant cardiac arrhythmia. JSMF ¶ 76.

The Plaintiff's expert, James Matthews, M.D., stated his opinion that appropriate screening required "maintaining [Michaud] on monitoring for a least overnight." JSMF ¶ 33. Dr. Mathews also stated that "syncope in a renal failure patient in an older man" is an emergency medical condition. JSMF ¶ 36.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it can impact the outcome of the case. *Johnson v. Univ. of P.R.*, 714 F.3d 48, 52 (1st Cir. 2013). To establish a genuine dispute, the

---

[4] Calais Regional Hospital policy requires an Against Medical Advice ("**AMA**") form upon discharge where a patient refuses treatment or transfer and is in an unstable condition. JSMF ¶ 43. Michaud was not asked to sign an AMA form. JSMF ¶ 40.

nonmoving party is not required to establish a dispute of fact conclusively in its favor, but rather "that a reasonable jury could resolve the point in the favor of the non-moving party" based on evidence in the record. *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008) (citation omitted). Courts must credit evidence in the record that is favorable to the non-movant and resolve all reasonable inferences in the non-movant's favor. *Burns v. Johnson*, 829 F.3d 1, 8 (1st Cir. 2016).

## DISCUSSION

A claimant may establish an EMTALA violation by showing that a covered hospital either (a) did not afford an appropriate screening or (b) improperly transferred or discharged a medically unstable patient. *Cruz-Vasquez v. Mennonite Gen. Hosp., Inc.*, 717 F.3d 63, 68 (1st Cir. 2013).

Subsection (a) of the statute provides that a hospital must deliver an "appropriate medical screening examination within the capability of the hospital's emergency department . . . to determine whether or not an emergency medical condition . . . exists." 42 U.S.C. § 1395dd(a). The statute does not define the phrase "appropriate medical screening," but the First Circuit has ruled that it must be "reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints." *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1192 (1st Cir. 1995). "The essence of this requirement is that there be some screening procedure, and that it be administered even-handedly." *Id.* A hospital protocol, where one exists, may serve as a "touchstone in gauging uniform treatment."

7

*Cruz-Vasquez*, 717 F.3d at 69; *see also Phillips v. Hillcrest Med. Cntr.*, 244 F.3d 790, 797 (10th Cir. 2001); *Powers v. Arlington Hosp. Ass'n*, 42 F.3d 851, 855 (4th Cir. 1994) (finding disparate treatment in the absence of a written hospital protocol where the treating physician testified as to what the typical procedure was at the hospital and a qualified expert testified that a missing test was necessary with the plaintiff's symptoms).

> EMTALA does not create a cause of action for medical malpractice. Therefore a refusal to follow regular screening procedures in a particular instance contravenes the statute, but faulty screening, in a particular case, as opposed to disparate screening or refusing to screen at all, does not contravene the statute.

*Correa*, 69 F.3d at 1192-93.

Subsection (b) provides that where a hospital determines a patient has an emergency medical condition, it "must provide either (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or (B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section." § 1395dd(b)(1). The threshold requirement for EMTALA subsection (b) liability is thus that "the hospital determines that the individual has an emergency medical condition." § 1395dd(b)(1); *see, e.g., Cruz-Queipo v. Hosp. Español Auxilio Mutuo de P.R.*, 417 F.3d 67, 71-72 (1st Cir. 2005) (finding a hospital not entitled to summary judgment where the hospital had not diagnosed a patient's heart condition but conceded that a complaint of chest pain constituted an emergency condition). The statute defines an "emergency medical condition" as:

> [A] medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in (i) placing the health of the individual . . . in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part.

§ 1395dd(e)(1)(A). The statute defines "stabilized" to mean "that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility." § 1395dd(e)(3)(B). Enumerated exceptions permit the transfer of an unstable patient, such as where the patient makes an informed, written request for transfer or a physician signs a certification that the medical benefits of transfer outweigh the risks. § 1395dd(c); *see also Correa*, 69 F.3d at 1192 (transfer is permissible where "medically indicated and can be accomplished with relative safety").

The Defendant builds an argument that the hospital was not aware of and did not diagnose Michaud with an emergency medical condition. It contends that because Michaud had no emergency medical condition, the hospital was not required to stabilize him. The Plaintiff responds that the four hour emergency room visit was an inadequate screening for someone presenting with Michaud's conditions. The Plaintiff further argues that Dr. Mullen knew that Michaud had an emergency medical condition because he correctly diagnosed Michaud with a syncope with a possible cardiac etiology. The Plaintiff points to Dr. Mullen and Dr. Matthew's deposition testimony, which suggests that the protocol for such a diagnosis in a patient over fifty would at least require overnight observation. Dr. Mullen seemed to follow that protocol when he determined Michaud should be transferred to Eastern

9

Maine Medical Center for further monitoring. Although Michaud was not happy about the transfer, he had resigned himself to it. The record sheds little light on what caused Dr. Mullen to change his mind and discharge Michaud.

Considering the facts and resolving all reasonable inferences in the non-movant's favor, I conclude that there exist genuine issues of material fact as to whether the screening offered was "reasonably calculated to identify critical medical conditions" given the decedent's history and presenting symptoms; whether an "emergency medical condition" existed and was known to the hospital; and whether Michaud was stabilized at the time he was discharged. Taking the facts in the light most favorable to the non-movant, a reasonable jury could find EMTALA violations. *See Burns*, 829 F.3d at 8.

## CONCLUSION

For the reasons stated above, the Court **DENIES** the Defendant's motion for summary judgment.


SO ORDERED.

/s/ Nancy Torresen
United States Chief District Judge

Dated this 7th day of March, 2017.